UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Conservation Law Foundation, Inc., )<br><br>    Plaintiff, )<br><br>    v. )<br><br>Durham School Services, L.P., )<br>Durham Holding II, L.L.C., )<br>and National Express LLC, )<br><br>    Defendants. ) | Case No. 1:22-cv-11992-RGS |

## CONSENT DECREE

WHEREAS, Plaintiff Conservation Law Foundation ("CLF" or "Plaintiff") filed this action on November 22, 2022 against Defendants Durham School Services, L.P. ("Durham"), Durham Holding II, L.L.C., and National Express LLC. (collectively, "Defendants").

WHEREAS, Plaintiff is a regional, non-profit environmental organization incorporated in Massachusetts;

WHEREAS, Plaintiff alleges in this action that Defendants violated the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* ("CAA" or "Act"), and the Massachusetts motor vehicle idling requirements contained within the federally enforceable Massachusetts State Implementation Plan ("SIP"), 310 C.M.R. § 7.11(1)(b), and seeks civil penalties, injunctive relief, and Plaintiff's attorneys' fees and costs of litigation;

WHEREAS, Defendants do not admit to any specific factual and legal allegations herein, except as provided in Section I (Jurisdiction and Venue), below;

WHEREAS, Plaintiff and Defendants (collectively "the Parties") have agreed to enter

1

into this Consent Decree because they believe that it is in the Parties' interests and the public

interest to proceed promptly with the actions called for in this Consent Decree rather than to

expend additional time and resources litigating the matters set forth herein;

WHEREAS, Plaintiff and Defendants (collectively "the Parties") have negotiated this

Consent Decree in good faith and at arm's length, and agree that the settlement of the above-

captioned action (the "Action") through this Consent Decree without further litigation is in the

public interest, and is a fair, reasonable, and appropriate means of resolving all claims in the

Action;

WHEREAS, the Parties anticipate that this Consent Decree will enhance public health

and the environment by improving air quality in Massachusetts;

WHEREAS, the Plaintiff and Defendants each consent to the entry of this Decree without

further trial, argument, or appeal;

WHEREAS, pursuant to 42 U.S.C. § 7604(c)(3), this Consent Decree is being forwarded

to the United States Department of Justice and to the United States Environmental Protection

Agency ("EPA") for the forty-five (45) day review period mandated by the Clean Air Act;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or

admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue),

below, and with the consent of the Parties,

IT IS HEREBY ADJUDGED, ORDERED AND DECREED as follows:

## I.    JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action, the subject matter herein, and over the

Parties consenting hereto, pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. § 1331.

2.      Venue properly lies in this Court and district pursuant to 42 U.S.C. § 7604(c)(1)

and 28 U.S.C. § 1391(b).

3.      Plaintiff gave Defendants notice by a letter (the "Notice Letter") of the violations alleged in the Complaint more than 60 days prior to commencement of this lawsuit. Copies of the Notice Letter were also mailed to the Administrator of the EPA, the Regional Administrator of the EPA for Region 1, the Massachusetts Department of Environmental Protection ("MassDEP") Commissioner, and the DOJ Citizen Suit Coordinator. Neither EPA nor MassDEP commenced any action prior to Plaintiff's filing of the Complaint.

4.      Defendants consent to this Court's jurisdiction and to venue in this judicial district. Defendants consent to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree. Except as expressly provided for herein, this Consent Decree shall not directly create any rights in or obligations of any Party other than the Parties to this Consent Decree.

5.      This Court shall retain jurisdiction over this case until the Termination Date for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying this Consent Decree, pursuant to Sections XI (Dispute Resolution) and XV (Modification), or effectuating or enforcing compliance with the terms of this Consent Decree.

## II.      APPLICABILITY

6.      Upon the Effective Date, the obligations of this Consent Decree shall apply to, and be binding upon, Plaintiff and Defendants, and any successors, assigns, or other entities or persons otherwise bound by law.

7.      In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of its officers, directors, employees, or agents to take any actions necessary to comply with the provisions of this Consent Decree.

3

8.     This Consent Decree shall take effect and become binding on the Parties only upon its entry by the Court without substantive modification.

### III.    DEFINITIONS

9.     Terms used in this Consent Decree that are defined in the Clean Air Act or in regulations promulgated by EPA and MassDEP pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.     "Effective Date": The date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

b.     "Environmentally Beneficial Project(s)": Projects that will reduce air pollution and improve the environment in Massachusetts, particularly in the neighborhoods where Defendants operate or have operated bus lots and bus routes. These projects will be implemented pursuant to the terms provided in Exhibit A.

c.     "EV Transition Project": The project described in Section VII.B. The EV Transition Project shall advance Durham's transition to zero-emission vehicles at the Holyoke lot (located at 103 South Street in Holyoke, MA 01040).

d.     "Implementing Organization(s)": Each of the third-party entities, Neighbor to Neighbor Massachusetts Education Fund and Nuestras Raíces, implementing the Environmentally Beneficial Projects described

in Exhibit A of this Consent Decree.

e. "Independent Investigator": A mutually selected independent third party, retained pursuant to the Independent Investigator Agreement, who will conduct investigations pursuant to Paragraphs 38-43.

f. "Northeast Region": The Region comprising of Massachusetts, Rhode Island, Connecticut, New Hampshire, Vermont, Maine, New York, New Jersey, and Pennsylvania.

g. "Termination Date": Five years after the Effective Date.

10. In the Consent Decree, unless the context otherwise requires:

a. References to Paragraphs, Sections, and Exhibits are references to paragraphs, sections, and exhibits of the Consent Decree;

b. The descriptive headings of the several Sections of the Consent Decree are inserted for convenience only, do not constitute a part of this Decree and shall not affect in any way the meaning or interpretation of the Consent Decree;

c. "Include", "includes", and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import; and

d. References to "Dollars", "dollars" or "$" without more are references to the lawful currency of the United States of America.

11. All references to a duration of "days" shall be calendar days unless otherwise specified. In computing any period of time under the Consent Decree, where the last day would fall on a Saturday, Sunday, federal holiday, or Massachusetts state holiday, the period shall run

5

until the close of business of the next business day.

## IV.   COMPLIANCE MEASURES

12.     The Defendants shall comply with the Massachusetts idling regulation, 310 CMR 7.11(1)(b), and all other applicable state idling regulations.

**A.    Revisions to Durham's Anti-Idling Policy**

13.     The Defendants shall review and revise as necessary Durham's written Engine Idle Reduction Policy and Anti-Idling Training Guide to conform to the law and explicitly prohibit vehicle idling in violation of the applicable idling regulation for each state in which Defendants' vehicles operate.

14.     The Defendants shall remove as necessary from Durham's Engine Idle Reduction Policy and Anti-Idling Training Guide any provisions which allow for idling in violation of the applicable idling regulation.

15.     The Defendants shall add to Durham's Engine Idle Reduction Policy and Anti-Idling Training Guide:

        a.      Explanations of the negative health effects of idling and vehicle exhaust (including effects on COVID-19 transmission); and

        b.      Strategies for idling cessation and use of idling cessation technologies.

16.     Durham's Engine Idle Reduction Policy and Anti-Idling Training Guide shall be distributed to all drivers and supervisors employed by Durham either via email and/or in print twice per year during anti-idling trainings.

17.     The Defendants shall require all new drivers and supervisors employed by Durham to acknowledge, in writing or electronically, receipt and understanding of Durham's Engine Idle Reduction Policy and Anti-Idling Training Guide.

18.     Durham's Engine Idle Reduction Policy and Anti-Idling Training Guide shall be translated into Spanish and any other language that a significant number of drivers or supervisors employed by Durham speak.

**B.     Signage and Communications**

19.     The Defendants shall continue to post clearly visible "No Idling" signs, notices, and posters that state the regulatory idling limits at all Durham transportation lots in the Northeast Region.

20.     The Defendants shall place "No Idling" stickers on the dashboard of each Durham bus operating in the Northeast Region.

21.     The Defendants will provide at least one anti-idling message per week to drivers, managers, and supervisors employed by Durham in the Northeast Region.

**C.     Training**

22.     The Defendants shall require all drivers, managers, and supervisors employed by Durham in the Northeast Region to receive anti-idling trainings twice per year. In addition, every new or rehired driver, manager, or supervisor will receive anti-idling training within 30 days of hiring.

23.     The Defendants shall offer additional anti-idling trainings upon request by a driver or supervisor.

<u>24</u>.     Anti-idling trainings shall address, at minimum, the following topics:

  a.     Durham's Engine Idle Reduction Policy and Anti-Idling Training Guide;

  b.     The relevant idling regulation, including exceptions;

7

     c.      Strategies for avoiding idling, including the elimination of unnecessary idling during pre- and post-trip inspections, while loading and unloading passengers, and excessive heating or cooling during cold or hot weather;

     d.      The negative health effects of idling and vehicle exhaust (including effects on COVID-19 transmission); and

     e.      Durham's anti-idling incentive program.

25.     All written training materials shall be translated into any other language that a significant number of drivers or supervisors speak and shall be distributed as necessary.

**D.    Encouragement of Transition to Electric Vehicles**

26.     Durham shall apply for all applicable grants to assist in its transition to electric vehicles and shall use any available electric vehicles in requests for proposals ("RFPs") that it responds to, both for new contracts and renewals or extensions of existing contracts. Durham shall encourage its clients to use electric vehicles. Durham and CLF shall agree upon language to be included in Durham's proposals regarding the environmental, economic, and health benefits of electric vehicles.

**E.    Emission Reduction Systems**

27.     The Defendants will continue using internal, remote Idling Monitor Devices in all nonelectric Durham buses (including all new nonelectric buses) operating in the Northeast Region.

28.     The Idling Monitor Devices shall report to Durham if any vehicle has been idling in violation of the applicable idling regulation.

29.     The Defendants shall employ Idling Monitor Devices to internally observe and reduce violations of the applicable state idling regulations.

30.     The Defendants shall continue to operate and maintain in each of its diesel buses operating in the Northeast Region an automatic shut-off mechanism, provided that such mechanism does not impact the warranty for those buses. For each such bus, the Defendants shall set this mechanism to turn off the engine after the vehicle has been idling for longer than is permitted by the applicable idling regulation and physically disconnect any "override" capability of the automatic shut-off mechanism, provided that action does not impact the warranty for the buses or the automatic shut-off mechanism.

31.     The Defendants shall continue to operate and maintain active or passive diesel particulate filters ("DPF") on each of its diesel buses operating in the Northeast Region which already have DPFs installed.

## F.     Incentive Programs

32.     The Defendants shall create an incentive program to reward drivers employed by Durham in the Northeast Region who do not idle excessively with incentives, including but not limited to, time off or bonuses.

## V.     COMPLIANCE MONITORING

## A.     Idling Enforcement Officers

33.     The Defendants shall designate at least one manager or supervisor to serve as the Idling Enforcement Officer for each shift at each bus lot operated by Durham in Massachusetts. The Idling Enforcement Officer will be in charge of the anti-idling incentive program and monitoring idling at those lots.

34.     Idling Enforcement Officers shall conduct unannounced walkthroughs in the lots at least twice a day during the periods when buses are starting up.

35.     The Idling Enforcement Officer shall immediately ask operators who are idling excessively and unnecessarily to stop.

36.     In cases where a driver is absent from the bus, the Idling Enforcement Officer shall shut off buses found idling without a clear need for such idling (such as maintenance).

37.     The Idling Enforcement Officer shall identify and document operators who idle in violation of the Massachusetts idling regulation, including drivers who repeatedly idle in violation of the Massachusetts idling regulation (more than three times in a two-week period).

**B.      Independent Investigations**

38.     The Parties and the Independent Investigator shall enter into the Independent Investigator Agreement, an enforceable private contract between the Parties and the Independent Investigator governing the retention, duties, reporting, and payment of the Independent Investigator.

<u>39</u>.     The Defendants shall pay for an Independent Investigator, selected jointly by CLF and the Defendants, who will conduct unannounced investigations at the Defendants' Holyoke lot up to 20 times over the course of this CD, not to exceed six times in the first year.

<u>40</u>.     The Independent Investigator will conduct investigations during weekdays from 5:30-8:30 am while the Holyoke Public Schools are in session.

41.     The Independent Investigator will complete a report and provide it to both Parties within one week of each investigation ("Independent Investigator Report").

42.     If the Independent Investigator reports no instances of excess idling by Defendants' vehicles during every audit performed in a calendar year, then no more than three audits will be performed in the following calendar year.

10

43.     If the Independent Investigator reports any instances of excess idling by Defendants' vehicles during an audit in a calendar year, then the audit frequency in Paragraph 39 will govern.

## VI.     COMPLIANCE REPORTING

44.     The Defendants shall send semi-annual Compliance Reports to CLF detailing the following:

    a.    Defendants' compliance with the walk-through and field check requirements;

    b.    All discipline (related to idling) that has been taken with noncompliant operators, and the remedies implemented to correct all instances of idling; and

    c.    All monies spent on the EV Transition Project, with attached vendor invoices, receipts, and vehicle registrations.

45.     The Defendants shall send ten semi-annual Compliance Reports as follows. The first Compliance Report shall cover the period from the Effective Date until six months following the Effective Date and shall be submitted within 45 days of the last day of the six-month period. The second Compliance Report shall be submitted within 45 days of the first anniversary of the Effective Date. Subsequent reports shall be submitted semi-annually on the anniversary of those two dates. The final Compliance Report shall be submitted on the Termination Date.

46.     The Defendants shall maintain records of the walkthroughs, field checks, disciplinary actions, related training, and the EV Transition Project and provide them to CLF

within 14 days of any request for them. CLF may request records up to four times per year during the CD period.

## VII.   PAYMENTS

**A.   EV Transition Project**

47.     Defendants shall spend $1,000,000 over the term of the Consent Decree on the EV Transition Project, as further described in Paragraphs 48-52.

48.     Defendants may file an application for the EPA Clean School Bus Program 2024 Grant, using the $1,000,000 as a cost-sharing proposal in the application.

49.     If Defendants do not receive the EPA Clean School Bus Program 2024 Grant, Defendants shall purchase at least one zero emissions bus.

50.     Any remaining funds dedicated for the EV Transition Project shall be spent, at Defendants' discretion, only on:

    a.    Cost-sharing proposals for grant applications for zero emissions buses, provided that Defendants confer with CLF prior to submitting any such grant applications;

    b.    The purchase or lease of additional zero emission vehicles, including school buses and/or other fleet vehicles, such as service vehicles, delivery vehicles, company cars, and safety cars;

    c.    The purchase of electric or solar-powered vehicle charging stations; and/or

    d.    Fees and costs associated with necessary electricity and infrastructure upgrades to accommodate charging stations and electric fleets.

51.     The EV Transition Project shall follow the following timeline:

    a.    At least $300,000 shall be spent within two years of the Effective Date;

        b.      An aggregate amount of at least $500,000 shall be spent within three years of the Effective Date; and

        c.      An aggregate amount of at least $1,000,000 shall be spent within five years of the Effective Date.

52.     Payment into the EV Transition Project shall not include grant proceeds, donations, or subsidies.

**B.    Environmentally Beneficial Projects (EBPs)**

53.     The Defendants will pay a total of $290,000 to fund Environmentally Beneficial Projects pursuant to the terms provided in Exhibit A ("EBP Funds"). The $290,000 shall be distributed to the Implementing Organizations within 90 days of the Effective Date.

54.     Each Implementing Organization will submit to CLF, pursuant to the notice provision in Section XIII (Notices), annual status reports due each year on the anniversary of the payment deadline in Paragraph 53 while EBP Funds are being spent. The status reports will include, at a minimum, the following information: (i) description of activities completed to date and related expenditures of EBP Funds and (ii) a discussion of any anticipated changes to the scope or timeline of the Environmentally Beneficial Projects. If the Implementing Organizations fail to spend EBP Funds in accordance with the terms provided in Exhibit A, Defendants and Plaintiff will have no additional obligations or liabilities.

**C.    Attorneys' Fees and Costs**

55.     Within thirty (30) days of the Effective Date, Defendants shall pay $135,000 by company check or wire transfer to Plaintiff, which shall resolve all claims for attorneys' fees, costs, or other expenses.

## VIII.   STIPULATED PAYMENTS

56.     The Defendants shall be liable for stipulated payments for each vehicle and each occurrence of idling in violation of this Consent Decree as recorded by the Independent Investigator. A vehicle shall be considered to be idling for the purpose of assessing stipulated payments while it has stopped and the engine has not been turned off, and no exceptions in 310 CMR § 7.11(1)(b) apply.

57.     Stipulated payments are as follows:

    a.     $150 per vehicle per occurrence for 1 to 5 minutes of excess unnecessary idling;

    b.     $300 per vehicle per occurrence for 6 to 10 minutes of excess unnecessary idling;

    c.     $2,000 for 11 to 30 minutes of excess unnecessary idling;

    d.     $3,000 for 31 to 60 minutes of excess unnecessary idling; and

    e.     $7,000 for 61 minutes or more of excess unnecessary idling.

58.     The stipulated payments listed in Paragraph 57 shall be subject to a tipping basket of $500 per month. If Defendants accrue stipulated payments as described above totaling $500 or more in any one-month period, Defendants shall pay the full amount of such stipulated payments to the first dollar. If Defendants do not accrue $500 of stipulated payments as described above in any one month, the basket is emptied, Defendants are not responsible for any stipulated payments in that month, and the basket starts at $0 for the next month.

59.     The Defendants shall be liable for stipulated payments for failure to comply with the Compliance Measures, Compliance Monitoring, and Compliance Reporting provisions of this Consent Decree. Stipulated payments are as follows:

14

a.      Failure to perform walkthroughs or to document walkthroughs: $500 per month;

b.      Failure to install or maintain "no idling" signs, notices, posters, and/or stickers at bus lots, at the facilities, and in the buses: $500 per month;

c.      Failure to meet driver training requirement: $100 per driver;

d.      Failure to retain documentation at facilities: $1,000 per request;

e.      Failure to provide documentation upon request: $1,000 per request; and

f.      Failure to provide semi-annual Compliance Reports: $500 per week.

60.     Stipulated payments pursuant to Paragraphs 57 and 59 of this Section shall be paid equally to the Implementing Organizations within 30 days of each missed deadline or report of idling from the Independent Investigator. Each of the two Implementing Organizations will receive 50% of the total stipulated payment amount.

61.     Defendants shall not deduct any payments made under Section VII (Payments) or Section VIII (Stipulated Payments) in calculating their federal, state, or local income tax.

## IX.    LATE FEES

62.     The Defendants shall pay $1,500 per week for any payments made pursuant to this CD that are more than 14 calendar days late. Payment will be made within 21 days of the failure to meet the deadline.

63.     Late fees for the late payment of the Plaintiff's fees and costs shall be paid to CLF.

64.     Late fees for the late payment of any EBP Funds or stipulated payments shall be paid to the Implementing Organization(s).

15

65.     The Defendants shall be liable for late fees for failure to make timely payments in accordance with the EV Transition Project timeline in Paragraph 51. Late fees for late payments in accordance with the EV Transition Project shall be paid to an escrow account, the purpose of which will be to fund additional investments in fleet electrification pursuant to the requirements of the EV Transition Project.

## X.     FORCE MAJEURE

66.     Defendants shall perform the actions required by this Consent Decree within the time limits established therein, unless the performance is prevented or delayed by events that constitute a Force Majeure event.

67.     "Force Majeure" is defined as any event arising from causes beyond the control of Defendants, their contractors, or any entity controlled by Defendants that delays or prevents the performance of any obligation under the Consent Decree despite Defendants' best efforts to fulfill the obligation. An increase in costs, a change in financial circumstances, or Defendants' economic inability to comply are not Force Majeure events.

68.     If any event occurs or has occurred that may delay or prevent compliance with the performance of any obligation under this Consent Decree, as to which Defendants intend to assert a claim as an event of Force Majeure, Defendants shall provide written notice to CLF of such claim, as soon as practicable but no later than ten working days following the date Defendants first had notice that the claimed Force Majeure event may cause such delay or impediment and give rise to a claim of Force Majeure. Upon receiving notice of Force Majeure, Plaintiff shall have the right to request all necessary documentation explaining the potential delay. If requested, Defendants shall have ten working days from the date of the request to provide the documentation. If Defendants request an extension of the deadlines specified in this

Consent Decree, Plaintiff shall have the right to grant all or part of the extension requested. Plaintiffs will not unreasonably withhold or condition an extension, but in the event that the Plaintiff does withhold an extension, Defendants shall have the right to apply to the Court for an extension of time, but shall have the burden of proving to the Court that refusal by Plaintiff to grant the requested extension was unreasonable based on the information then available to Plaintiff. Defendants shall not be required to pay stipulated payments during the time between the date on which Plaintiff receives such a request from Defendants for an extension of the deadlines and the date on which a final decision is issued regarding such request. If the final decision denies Defendants' request for an extension, Defendants shall pay all stipulated penalties that were deferred during the pendency of the request.

## XI.    DISPUTE RESOLUTION

69.    If the Plaintiff has reason to believe that Defendants may be in violation of this Consent Decree, Plaintiffs may request, in writing, that the Parties meet and confer, for the purpose of determining whether a violation has occurred and developing a mutually agreed upon plan, including implementation dates, to resolve the dispute.

70.    The Parties agree to work together in good faith to resolve all disputes before bringing them before this Court.

71.    If, following the Plaintiff's written notification under Paragraph 69, the meet and confer does not resolve the dispute and result in a mutually agreed upon plan, or the Defendants do not provide an initial response to Plaintiff's request for a meet and confer within 14 days, the Plaintiff shall be entitled to bring the dispute before this Court for resolution.

72.     The Court shall retain jurisdiction over this case until the Termination Date to enforce the terms and conditions of the Consent Decree, to modify the Consent Decree, and to resolve any disputes arising hereunder.

## XII.     EFFECT OF SETTLEMENT

73.     Entry of this Consent Decree shall resolve any and all claims, causes of action, or liability arising under the CAA and Massachusetts state law brought by the Plaintiff against the Defendants for damages, penalties, fines, injunctive relief, past and future attorney's fees, past and future costs, or any other claim or relief relating to the violations that were alleged, or could have been alleged, in the Complaint or in this action. Plaintiff covenants not to sue, releases, and forever discharges Defendants from all such claims, causes of action, or liabilities arising on or before the Effective Date.

74.     CLF covenants not to sue and shall not bring any claim, cause of action, or suit against Defendants for any alleged violations of the same nature or type as those described in the Complaint that occur prior to the Termination Date. Plaintiff's exclusive remedy for any such claims against Defendants, or other claims related to excess idling of Defendants' vehicles, arising after the Effective Date and prior to the Termination Date shall be through the stipulated payments described in this Consent Decree, subject to the outcome of any dispute resolution process.

75.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XIII.   NOTICES

76.     The requirements of Sections IV.B, IV.C, and V ("Ongoing Idling Compliance Measures") apply to those lots where Durham operates non zero-emission vehicles. Accordingly,

18

if Durham eliminates all non zero-emission vehicles from a Northeast Region lot, it may provide written notice to CLF of the location where non zero-emission vehicles are no longer operating, and Durham may immediately discontinue its compliance with Ongoing Idling Compliance Measures at said location. If Durham subsequently re-commences operating non zero-emission vehicles at such lot, it must provide written notice to CLF and re-commence Ongoing Idling Compliance Measures at said lot. For avoidance of doubt, Section VI reporting requirements shall apply so long as Durham continues to operate any non zero-emission vehicles in Massachusetts.

77.     Unless otherwise provided herein, whenever notifications, submissions, or communications are required by the Consent Decree, they shall be made in writing and addressed as follows:

For Plaintiff:
Clean Air and Water Paralegal
Ruby Verbitsky
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
rverbitsky@clf.org

For Defendants:
Stephen Schmuck
Vice President of Operations, New England, Louisiana & Florida Region
2341 Boston Road, Suite C220
Wilbraham, MA 01095
sschmuck@durhamschoolservices.com

Deanna McCollian
VP & ACG, Real Estate and Environmental
National Express, LLC
2601 Navistar Dr. Bldg. 5
Lisle, IL 60532
Deanna.McCollian@nellc.com

Christina S. Marshall
Anderson & Kreiger LLP

19

50 Milk Street, 21st Floor
Boston, MA 02108
cmarshall@andersonkreiger.com

78.     Any Party may, by written notice to the other Party, change its designated notice recipient, address, or means of transmittal provided above.

79.     All notifications, communications, or submissions made pursuant to this Section shall be sent by electronic mail if practicable, but if not practicable, then by overnight mail or overnight delivery service. Any Party planning a communication by non-electronic means should first attempt to contact the opposing Party to confirm the appropriate mailing address.

## XIV.   EFFECTIVE DATE & TERMINATION

80.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's Docket (the "Effective Date"). All obligations arising under the Consent Decree shall become effective as of the Effective Date.

81.     The Consent Decree shall terminate five years after the Effective Date (the "Termination Date").

## XV.   MODIFICATION

82.     The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the Parties. Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court. Plaintiff's decision to extend a deadline in this Consent Decree shall not constitute a material change for purposes of this Paragraph.

## XVI.   SIGNATORIES/SERVICE

83.     Each undersigned representative of the Parties certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

## XVII. INTEGRATION

84.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.

## XVIII. FINAL JUDGMENT

85.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Plaintiff and Defendants.

**SIGNATURE PAGE**

**Conservation Law Foundation, Inc.**

By: _____     Date: July 12, 2024

Heather A. Govern
Vice President and Director, Clean Air and Water
Conservation Law Foundation


**Durham School Services, L.P., Durham Holding II, L.L.C., National Express L.L.C.**

By: _____     Date: July 12 2024

Timothy Wertner
President and Chief Executive Officer
Durham School Services, L.P., Durham Holding II, L.L.C., National Express L.L.C.


Dated and entered this 29th Day of August, 2024.

_____
United States District Court Judge

## EXHIBIT A

## I.   ENVIRONMENTALLY BENEFICIAL PROJECT DESCRIPTIONS

### PROJECT 1: ENERGY EFFICIENCY AND DECARBONIZATION IN WORCESTER

Implementing Organization: Neighbor to Neighbor Massachusetts Education Fund

Project Funds: $145,000

Project Description:

**Preparing for decarbonization.** The Neighbor to Neighbor Massachusetts Education Fund (N2N) will work with tenants of triple decker housing in Worcester to promote equity-centered upgrades to old triple-decker housing, including decarbonization and green technology retrofits. Before the buildings are eligible for these decarbonization and retrofits, they must meet code requirements. N2N's Worcester organizer will build a membership base of tenants and work with them to catalog code violations so the city can address them. This work will advance the recommendations from the Worcester Partnership for Healthy, Equitable, Affordable Retrofits, and Training's year-long feasibility study into pathways forward for energy efficiency and electrified housing launched by the Climate & Environmental Justice Committee of the Worcester NAACP.

**Community decarbonization education.** N2N will create a one-stop shop for Worcester residents to connect with community energy advisors and learn how they can take advantage of energy efficient technologies. N2N will also provide workshops and trainings on decarbonizing buildings and the benefits to air quality and the climate. Through N2N's community education, Worcester residents will learn about existing retrofit opportunities and funding.

Projected Air Quality Benefits: This project will reduce air pollution in Worcester by advancing the transition of homes away from fossil fuel-burning heating and cooking technologies. Gas and

23

oil-powered heating systems and gas stoves release air pollutants, including particulate matter, benzene, nitrogen oxides, and carbon monoxide, as combustion byproducts. These pollutants (which mirror those pollutants emitted in tailpipe exhaust) are dangerous to human health and have been linked to asthma and other respiratory diseases. Electric heating systems and stoves result in less air pollution as they are significantly more efficient and rely on power produced by a mix of renewable energy (about 30% in Massachusetts in 2022) and natural gas.

**PROJECT 2: PROMOTING URBAN FARMING IN HOLYOKE**

Implementing Organization: Nuestras Raíces, Inc.

Project Funds: $145,000

Project Description:

**Community gardens.** Nuestras Raíces will acquire and improve the land of three vulnerable garden spaces with additional perennial plantings, infrastructure, and free community programming. Two gardens are currently owned by the city of Holyoke, and the third is part of the estate of a recently deceased longtime community business owner. All three face the threat of development and the subsequent displacement of the gardens. Nuestras Raíces plans to buy all three gardens with matching funds from the MDAR Urban Agriculture Land Acquisition Grant to ensure their long-term viability. Nuestras Raíces will also continue educational programming at the garden sites and purchase and plant more perennials with student leaders. Educational programming at the gardens teaches collaborative gardening, climate literacy, and environmental stewardship, including climate change mitigation strategies.

**Farm infrastructure.** Nuestras Raíces will refurbish a large greenhouse for year-round food production by installing a compost-fed biodigester system for seasonal heating and collaborating with area food businesses and the Holyoke Public School District for compost

collection. The greenhouse will grow sensitive tropical perennials and other culturally relevant annual vegetables and herbs.

Projected Air Quality Benefits:

Nuestras Raíces's community gardens and urban farm infrastructure projects will improve air quality in Holyoke both directly and indirectly. Urban green spaces provide much needed air filtration in a city that suffers from consistently poor air quality from industry and highway exhaust. Pollutants in the air adhere to plant surfaces and are directly absorbed into the plant. Urban vegetation can also create a cooling effect in the urban environment by blocking incoming solar radiation, dispersing light reflected from urban surfaces, providing shade, and releasing cooling water vapor into the atmosphere. This cooling effect reduces the need for air conditioners and other polluting cooling mechanisms, while also reducing heat-dependent, pollutant-producing chemical reactions in the atmosphere.

Nuestras Raíces's educational programs will promote improved air quality by teaching participants how to reduce their personal use of air polluting fossil fuel technologies and how to grow their own gardens, contributing to more urban green space in Holyoke.

By giving Nuestras Raíces the capacity to grow foods locally in Holyoke using renewable energy, the farm infrastructure project will improve air quality by reducing air pollution from food transit, diverting food waste from landfills, and decreasing the use of fossil fuels for heating. Growing culturally relevant tropical foods locally will decrease community dependency on imported produce, shortening the supply chain and reducing shipping emissions. Although an average of 30-40% of food is wasted and food waste contributes 8-10% of greenhouse gas emissions globally, Holyoke Public Schools currently doesn't have a plan in place for food waste diversion. By sending food waste to Nuestras Raíces's compost-fed biodigester rather than to

25

landfills, Holyoke Public Schools will reduce landfill emissions of methane and other air pollutants. Finally, by using a compost-fed biodigester rather than an oil or gas-powered system to heat its greenhouses, Nuestras Raíces will avoid emitting fossil fuel combustion byproducts and contributing to air pollution.

## III.   General Obligations and Reporting

A.   <u>Annual Status Reports:</u> Each Implementing Organization shall submit to CLF an annual status report each year that EBP Funds are being spent pursuant to Paragraph 54.

B.   <u>Unspent Funds:</u> Any EBP Funds that remain unspent as of five calendar years after the date of entry of the Consent Decree by the Court will be directed to community environmental projects in Massachusetts that are similar to or serve similar purposes as the Environmentally Beneficial Projects. In the event that unspent EBP Funds exist, the Implementing Organization will submit to CLF an accounting of such funds and a description of the intended use for such unspent EBP Funds.